UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STACY GRADNEY, et al., | Case No. 25-cv-02149-EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| POLAR BEVERAGES, | |
| Defendant. | Docket No. 17 |

Plaintiffs Stacy Gradney and Sharon Toll have brought a false advertising class action against Defendant Polar Beverages ("Polar"). Polar sells a product, flavored seltzer water, that it labels "100% Natural." Plaintiffs assert that the "100% Natural" label is false because the product actually contains synthetic ingredients. Now pending before the Court is Polar's motion to dismiss. Having considered the parties' briefs as well as the oral argument of counsel, the Court hereby **GRANTS** Polar's motion.

## I.      FACTUAL & PROCEDURAL BACKGROUND

In their complaint, Plaintiffs allege as follows.

Polar is a company that manufactures, markets, and sells seltzer water. The seltzers are sold in a variety of flavors – *e.g.*, lime, cranberry lime, black cherry, and so forth. *See* Compl. ¶ 2. "Other than the flavor, the designation on the packaging is identical." Compl. ¶ 2. Most notably, the front of each package states that the seltzer water is "100% Natural." *See* Compl. ¶ 3.

The seltzers are not, in fact, "100% Natural." There are two basic ingredients in the

1    product: carbonated water and "natural flavors."[1]  *See* Compl. ¶ 5.  "[A] natural flavor is anything

2    that can be extracted from an animal or plant source.  It is called 'natural' because the original

3    source of the flavor additive is not man-made."  Compl. ¶ 43.  But even though a natural favor

4    "originat[es] from a single natural source, the finalized flavor can contain as many as 250

5    chemically identified constituents, some of which are artificial and synthetic."  Compl. ¶ 43.

6    "[W]hile it is possible to synthesize a 'natural flavor' that is ultimately devoid of synthetics, it is

7    equally possible that the end result is one replete with synthetic ingredients."  Compl. ¶ 47.

8         Plaintiffs conducted testing on "multiple samples" of Polar's seltzer water, Compl. ¶ 54, to

9    determine whether the product contains any synthetics (*i.e.*, because of the use of natural flavors).

10   *See* Compl. ¶ 56 ("Since there are only two ingredients listed on the Product label, the near

11   definitive source of the synthetic[s] . . . is from the flavoring.").  Specifically, Plaintiffs conducted

12   radiocarbon (C-14) testing.

13        Radiocarbon testing can show what percentage of Biobased Carbon there is in in a product.

14   "100% Biobased Carbon indicates that a material is entirely sourced from plants or animal by-

15   products (*i.e.*, 100% Natural).  Any result less than 100% Biobased Carbon indicates the presence

16   of synthetics (i.e., petrochemicals) in the samples."  Compl. ¶ 54.  The testing of Polar's seltzer

17   showed that it is only 87-91% Biobased Carbon.  *See* Compl. ¶ 55.  Thus, Polar's seltzer "is

18   comprised of 9-13% fossil carbons, confirming the presence of synthetic carbon in the Product."

19   Compl. ¶ 55.

20        In addition to the above, Plaintiffs conducted "analytics using GC Mass Spectrometry in an

21   effort to identify the likely synthetics.  The results show the presences of ocimene quintoxide, a

22   known synthetic, and a series of terpineols (*e.g.*, 4-Terpineol, α-Terpineol, 1-Terpineol) that are

23   often used in flavorings in their synthetic forms."  Compl. ¶ 57.

24        Based on, *inter alia*, the above allegations, Plaintiffs have brought a class action against

25   Polar based on a number of different claims.  Some claims are brought on behalf of a nationwide

26

27   ─────────────────────────

28   [1] "'Natural Flavor' is the fourth most common ingredient on food labels with only salt, water and
     sugar mentioned more frequently."  Compl. ¶ 41.

class; others are brought on behalf of a statewide class.  (Ms. Gradney is a California resident; Ms. Toll is a New York resident.  *See* Compl. ¶¶ 14, 22.)  The claims are as follows:

(1) Breach of express warranty.  Plaintiffs indicate that the claim is based on both California law (Cal. Com. Code § 2313) and New York law (N.Y. CLS UCC §§ 2313, 2-607).  *See* Compl. ¶ 89.  However, it is not clear whether Plaintiffs are limiting this claim to a California subclass and New York subclass or whether Plaintiffs are asserting a nationwide class.

(2) Violation of California Business & Professions Code § 17200 – unlawful prong.  Plaintiffs expressly limit this claim to a California subclass.

(3) Violation of California Business & Professions Code § 17200 – unfair prong.  Plaintiffs expressly limit this claim to a California subclass.

(4) Violation of California Business & Professions Code § 17200 – fraudulent prong.  Plaintiffs expressly limit this claim to a California subclass.

(5) False advertising in violation of California Business & Professions Code § 17500.  Plaintiffs expressly limit this claim to a California subclass.

(6) Violation of the California Consumer Legal Remedies Act ("CLRA").  Plaintiffs expressly limit this claim to a California subclass.

(7) Violation of New York's Consumer Protection from Deceptive Acts and Practices Law – deceptive acts.  Plaintiffs expressly limit this claim to a New York subclass.

(8) Violation of New York's Consumer Protection from Deceptive Acts and Practices Law – false advertising.  Plaintiffs expressly limit this claim to a New York subclass.

(9) Restitution based on quasi-contract/unjust enrichment.  Plaintiffs assert a nationwide class for this claim.

## II.    DISCUSSION

A.    Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

1    complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

2    Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss

3    after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic*

4    *Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must .

5    . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d

6    1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and

7    construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St.*

8    *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a

9    complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient

10   allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

11   effectively."  *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).   "A claim has facial

12   plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

13   inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The

14   plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

15   possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).

16        Because, in the case at bar, Plaintiffs have essentially claimed false advertising, Federal

17   Rule of Civil Procedure 9(b) is also implicated.  Rule 9(b) provides that, "[i]n alleging fraud or

18   mistake, a party must state with particularity the circumstances constituting fraud or mistake.

19   Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

20   Fed. R. Civ. P. 9(b).

21            To satisfy this requirement, a pleading must identify "the who, what,
             when, where, and how of the misconduct charged," as well as "what
22           is false or misleading about [the purportedly fraudulent] statement,
             and why it is false."  This heightened pleading standard serves two
23           main purposes.  First, allegations of fraud "must be specific enough
             to give defendants notice of the particular misconduct which is
24           alleged to constitute the fraud charged so that they can defend
             against the charge and not just deny that they have done anything
25           wrong."  Second, the rule serves "to deter the filing of complaints as
             a pretext for the discovery of unknown wrongs, to protect
26           [defendants] from the harm that comes from being subject to fraud
             charges, and to prohibit plaintiffs from unilaterally imposing upon
27           the court, the parties and society enormous social and economic
             costs absent some factual basis."

28

United States District Court
Northern District of California

1   *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018).

2   B.     Polar's Arguments Affecting All Claims

3          In its motion to dismiss, Polar raises several arguments that affect all claims.  Specifically,

4   Polar makes the following arguments as to why all claims asserted in the complaint should be

5   dismissed:

6              (1) Plaintiffs do not identify what the alleged synthetics in the product are or explain

7                  how they are not natural.

8              (2) Plaintiffs do not allege that *their* purchases of the seltzer water contained anything

9                  non-natural.

10             (3) At best, Plaintiffs have simply alleged that the seltzer water contains trace amounts

11                 of non-natural substances.

12             (4) Plaintiffs do not allege that they were exposed to the "100% Natural" label at the

13                 time they made their purchases.

14  Each of these arguments is addressed below.

15         1.     Alleged Synthetics

16         As noted above, Polar's first argument is that dismissal is warranted because Plaintiffs

17  have failed to identify what alleged synthetics are in the seltzer water.

18         Polar is correct that there should be an identification of the alleged synthetics so that it can

19  properly defend itself – or at least the factual basis for the claim that there are synthetics should be

20  explained.  *See Nelson v. Campbell Soup Co.*, No. 14cv2647 DMS (JLB), 2015 U.S. Dist. LEXIS

21  190317, at *4-5 (S.D. Cal. May 18, 2015) (where plaintiff alleged defendant's "100% natural"

22  label was false because product at issue contained one or more genetically modified ingredients,

23  holding that fair notice was not given because plaintiff did not "identify the ingredient or

24  ingredients that is or are genetically modified, either in the product she purchased or any other

25  Prego-branded sauce that she or other California consumers purchased"); *see also Krakauer v.*

26  *Rec. Equip., Inc.*, C22-5830 BHS, 2024 U.S. Dist. LEXIS 65346, at *30 (W.D. Wash. Mar. 29,

27  2024) (where plaintiff sued REI on the basis that its marketing of its products as safe and

28  sustainable was false, stating that "[defendant] cannot meaningfully defend itself without knowing

United States District Court
Northern District of California

5

1    the chemical at issue so that it can prove that the chemical is not in the [product at issue], is not

2    dangerous, and/or would not be material to reasonable consumers"). Plaintiffs do not really

3    dispute there is a requirement of identification, if only as a matter of fair notice.

4    Rather, Plaintiffs' position is that they *have* sufficiently identified the alleged synthetics.

5    To the extent Plaintiffs suggest that they have sufficiently identified the alleged synthetics because

6    they have pled that the synthetics are in the "natural flavors," *see* Compl. ¶ 56 (alleging that,

7    "[s]ince there are only two ingredients listed on the Product label, the near definitive source of the

8    synthetic[s] . . . is from the flavoring"); Opp'n at 5 (arguing that Plaintiffs identified the synthetic

9    ingredient – "*i.e.*, natural flavors"), that argument is problematic. To be sure, Polar knows what

10   natural flavors it is using. However, that does not put Polar on fair notice of what specific

11   ingredient(s) in the flavoring is the synthetic. Presumably, if Plaintiffs are testing for synthetic

12   ingredients, they will be able to explain what synthetic ingredients they found and in which

13   flavors.

14   On the other hand, Plaintiffs point out that they did provide some additional specificity

15   regarding the natural flavors in their complaint. For example, they alleged in the complaint that

16   they conducted "analytics using GC Mass Spectrometry in an effort to identify the likely

17   synthetics. The results show the presences of **ocimene quintoxide**, a known synthetic, and a

18   series of **terpineols** (*e.g.*, 4-Terpineol, α-Terpineol, 1-Terpineol) that are often used in flavorings

19   in their synthetic forms." Compl. ¶ 57 (emphasis added).

20   Polar suggests it is too conclusory to say that ocimene quintoxide is a "known synthetic" –

21   *i.e.*, more of an explanation is needed as to why it is not natural. But that is nitpicking. It can

22   reasonably be inferred that ocimene quintoxide is never a natural substance given the use of the

23   word "known."

24   That being said, Polar makes a fair criticism that Plaintiffs' allegation about terpineols

25   suggests that *sometimes* the chemical can be natural and *sometimes* the chemical can be synthetic.

26   That the chemical is "*often* used in flavorings in [its] synthetic form[]," Compl. ¶ 57 (emphasis

27   added), is not enough to infer that Polar's seltzer water actually used the synthetic, as opposed to

28   natural, form.

1      Finally, the Court takes into account Plaintiffs' allegations about the radiocarbon testing.

2      As alleged in the complaint, the testing of the seltzer showed that it is only 87-91% Biobased

3      Carbon and, thus, Polar's seltzer "is comprised of 9-13% *fossil carbons*, confirming the presence

4      of synthetic carbon in the Product."  Compl. ¶ 55 (emphasis added).  Polar makes a fair point that

5      it is not clear how there could be a non-natural fossil carbon.  On the other hand, if a fossil carbon

6      indicates a petrochemical (as Plaintiffs suggest), one might not expect such to be in a product

7      labeled "100% Natural" since that label suggests a healthy, "clean" product.  To the extent that

8      Plaintiffs intend to rely on the radiocarbon testing, they should clarify how the testing supports

9      their claim that the "100% Natural" label is false or misleading.  Greater specificity is required.

10      To summarize, based on the analysis above, Plaintiffs have adequately identified one

11      synthetic in the product – ocimene quintoxide.  But for reasons noted herein, the mere

12      identification of one synthetic in some product is not sufficiently specific to satisfy pleading

13      requirements under the federal rules.

14          2.      Plaintiffs' Purchases

15      Polar also argues for dismissal of all claims because Plaintiffs have not alleged that *their*

16      purchases of the seltzer water contained synthetic substances.  Polar recognizes that Plaintiffs did

17      some testing of its seltzer water but argues that, "[f]or that testing to supply an inference that

18      Plaintiffs' purchases contained synthetics, at minimum it must demonstrate that so large a

19      proportion of Polar's seltzers sold during the span of Plaintiffs' 2023-2024 purchase histories

20      contained non-natural substances that Plaintiffs' own purchases must also have."  Mot. at 6

21      (noting that complaint simply refers to "multiple" samples being tested, which could mean just

22      two samples were tested); *see also* Compl. ¶ 7 (alleging that radiocarbon testing was done on

23      "multiple samples of Polar Seltzer").  Polar also contends that it is a problem for Plaintiffs not to

24      have disclosed what flavors of seltzer water were tasted.  *See* Mot. at 7 (arguing that "[t]his is a

25      glaring void in light of the complaint's 'near definitive' assertion that the supposedly synthetic

26      substances are components of the seltzers' different flavorings[;] [t]o impart taste profiles as

27      disparate as 'orange vanilla' and 'ruby red grapefruit,' flavorings vary in composition from one

28      flavor to the next").

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1    Polar's first argument is based on this Court's decision in *Phan v. Sargento Foods*, No. 20-

2  cv-09251, 2021 U.S. Dist. LEXIS 103629 (N.D. Cal. June 2, 2021).  There, the plaintiff alleged

3  that a label of "No Antibiotics*" used on defendant's cheese products was false because "'at least

4  some of the Products . . . still contain detectable levels of antibiotics.'"  *Id.* at *8.  The Court held

5  that the plaintiff lacked standing to pursue his claim because he had simply alleged that some of

6  the defendant's products – "not all or most" – contained antibiotics and he had not alleged that he

7  purchased one of the products containing antibiotics.  *Id.* at *12.  The Court then stated that the

8  plaintiff's standing was not

9        saved by any implication that there is a **systemic problem** with
10       Sargento's Products from which one could infer that the Product
         Plaintiff purchased was also tainted.  Plaintiff has alleged that
11       antibiotics were detected in one Product (different from the one
         Plaintiff purchased) based on one test, but this allegation *by itself* is
12       insufficient to show that all or most Products contain antibiotics.
         There is no indication that the single test of a single product is likely
13       representative of other Sargento Products and, if so, why.

14  *Id.* at *13 (italics in original; bold added).

15    As Polar argues, Plaintiffs' claims are deficient because they have not alleged that there

16  was testing of flavors they purchased or that the flavors tested are somehow representative.  This

17  is especially true because, as Polar points out, Plaintiffs' position is that the synthetics are in the

18  natural flavors.  It should not be difficult for Plaintiffs to make additional allegations – *e.g.*, that

19  they tested *x* different flavors (out of *y* flavors total) with the challenged labeling, that the flavors

20  tested included those purchased by Plaintiffs, and/or that the flavors tested are representative with

21  respect to the presence of synthetic chemicals (*i.e.*, suggesting either the flavors purchased

22  contained the chemicals or there is a systemic problem with the product that spanned most or all

23  flavors).[2]

24    3.    Trace Amounts of Synthetics

25    Polar's next contention is that the claims are deficient because at most they simply allege

26

27  _____
    [2] At the hearing, Plaintiffs disclosed for the first time that they did testing of only one seltzer water
28  flavor (lime) – a flavor that both Plaintiffs purchased.  Plaintiffs indicated that they would do
    testing of additional flavors to establish that there is/was a systemic problem with the product.

trace amounts of synthetics and such minimal amounts do not render the label "100% Natural"

misleading to a reasonable consumer.

This Court addressed a similar issue in *Phan*:

> Sargento . . . argues that the false advertising claim is implausible because the independent laboratory testing on which Plaintiff relied in the complaint showed only a de minimis amount of antibiotic. *See* Def.'s RJN, Ex. 5 (in a different case filed by Plaintiff's counsel against Sargento, referring to the same independent laboratory testing in the applicable complaint (¶ 29) and providing specifics about that testing - i.e., that 0.985 parts per billion of sulfamethazine were detected); Mot. at 16 (explaining that 0.985 ppb is the equivalent of one ounce in 7.75 million gallons). The gist of this argument is that a reasonable consumer would not be misled by the "No Antibiotics*" label because a reasonable consumer would understand that it would be nearly impossible to have *zero* antibiotics. In other words, a reasonable consumer would still see the "No Antibiotics*" label as accurate even if there were trace amounts of an antibiotic present. However, **what a reasonable consumer would think is a factual dispute** that cannot be resolved at the 12(b)(6) phase of proceedings. *Cf., e.g., Berke v. Whole Foods Mkt.*, No. CV 19-7471 PSG (KSx), 2020 U.S. Dist. LEXIS 184346, at *33-34 (C.D. Cal. Sept. 18, 2020) (at 12(b)(6), disagreeing with defendant that a reasonable consumer could not understand a label that water was "pure" or "pristine" to mean that the water did not have arsenic in it just because arsenic is "naturally occurring"); *Tran v. Sioux Honey Ass'n, Coop.*, No. 8:17-cv-110-JLS-JCSx, 2018 U.S. Dist. LEXIS 146380, at *17-18 (C.D. Cal. Aug. 20, 2018) (taking note of defendant's argument that, "many, if not all, agricultural products contain trace amounts of pesticide" and that plaintiff's "definition of the term '100% Pure' would essentially preclude any seller of agricultural products from using the term to describe their goods"; but stating that this argument of business difficulty "do[es] not go towards establishing what reasonable consumers would understand the terms '100% Pure' or 'Pure' to mean" – and, "[t]o the extent a reasonable consumer considers the honey production process and the prevalence of herbicide use in the modern world when evaluating the term 'Pure,' those involve factual issues that should be tested through discovery"); *Organic*, 284 F. Supp. 3d at 1014-15 (acknowledging defendant's contention that "a reasonable consumer would not interpret 'natural as stringently as the plaintiffs propose or be surprised to learn that [defendant's] products have trace amounts of synthetic materials like antibiotics" but finding a question of fact on the issue).

> The Court acknowledges that there is case law to support Sargento's position. *See, e.g., Yu v. Dr Pepper Snapple Grp., Inc.*, No. 18-cv-06664-BLF, 2020 U.S. Dist. LEXIS 185322, at *11 (N.D. Cal. Oct. 6, 2020) (in case where defendant's product was labeled "Natural" or "All Natural Ingredients," rejecting plaintiff's argument that "reasonable consumers interpret the word natural to mean a food product that is completely free of any trace pesticides"); *In re Gen. Mills Glyphosate Litig.*, No. 16-2869 (MJD/BRT), 2017 U.S. Dist.

1

2

3

4

> LEXIS 108469, at *16-17 (D. Minn. July 12, 2017) (holding that "it is not plausible to allege that the statement 'Made with 100% Natural Whole Grain Oats' means that there is no trace glyphosate in Nature Valley Products or that a reasonable consumer would so interpret the label[;] [i]t would be nearly impossible to produce a processed food with no trace of any synthetic molecule").  But the Court finds this authority less persuasive.

5    *Phan*, 2021 U.S. Dist. LEXIS 103629, at *9-11 (emphasis added).

6          Given *Phan*, the Court rejects Polar's argument.[3]  This issue cannot be decided at the Rule

7    12(b)(6) stage.

8          4.    Products Bearing the Challenged Label

9          Finally, Polar argues that Plaintiffs have failed to plead that the products they purchased

10   had the "100% Natural" labeling.  According to Polar, "it is likely that Plaintiffs cannot plead such

11   exposure or any corresponding reliance, given that Polar removed the challenged labeling three

12   years ago when revising the seltzers' packaging, considerably before Plaintiffs purchased [in

13   2023-2024]."  Mot. at 9-10; *see also* Compl. ¶¶ 15, 23 (alleging purchases of product in 2023-

14   2024 period).

15         The Court rejects Polar's claim that Plaintiffs could not have pleaded exposure because it

16   had already removed the challenged labeling (*i.e.*, by the time of their purchases).  That is

17   information beyond the four corners of the complaint.  So long as Plaintiffs' have a Rule 11 good

18   faith basis for their allegation, that is sufficient.

19         Polar's assertion that Plaintiffs have failed to allege that the products they purchased had

20   the "100% Natural" label is also problematic.  All reasonable inferences are to be made in

21   Plaintiffs' favor.  It can reasonably be inferred from the complaint that Plaintiffs purchased

22   products with the "100% Natural" label.  *See, e.g.*, Compl. ¶¶ 16, 24 (alleging that each Plaintiff

23   "believed the representations on the Products' packaging – that she was consuming Beverages that

24   were 100% Natural and otherwise devoid of synthetic ingredients"); Compl. ¶¶ 18, 26 (alleging

25   that each Plaintiff "relied on Defendant's labeling").

26         Polar's only comeback in its reply brief is that it is not clearly alleged that Plaintiffs saw

27

28   _____

[3] Plaintiffs also fairly argue that the glyphosate cases (such as those cited above) are distinguishable since those cases dealt with "a pervasive and ubiquitous herbicide."  Opp'n at 10.

United States District Court
Northern District of California

the label "at the time of their purchases" specifically.  Reply at 8 (emphasis omitted).  However, that is something that can reasonably be inferred.  For example, right before the allegation that each Plaintiff believed the representation on the label, it is alleged that each Plaintiff purchased the product.  Thus, it can reasonably be inferred that each Plaintiff believed the representation *at the time of purchase*.

5.    Summary

Based on the above, the Court dismisses all of Plaintiffs' claims because, although some of Polar's arguments lack merit, some are persuasive.  In particular, Plaintiffs have not alleged that there was testing of flavors they purchased and/or that the flavors tested are somehow representative.  Also, the only alleged synthetic that Plaintiffs have adequately identified is ocimene quintoxide.  The Court, however, grants Plaintiffs leave to amend to address the deficiencies identified above.

C.    Claims Seeking Equitable Relief

Although dismissal of all of Plaintiffs' claims is warranted for the reasons stated above, the Court still addresses Polar's arguments targeted to specific claims because this will inform the amendment the Court is permitting.

Polar's first challenge to specific causes of action relates to claims seeking equitable relief.  For some of the causes of action pled by Plaintiffs, only equitable relief is available – specifically, the § 17200, § 17500, and unjust enrichment claims.  For other claims, both legal damages and equitable relief are sought.  Polar argues that, where equitable relief is sought, dismissal is required because Plaintiffs have failed to allege the inadequacy of legal remedies.

Polar's argument is predicated on *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020).  In a prior decision, this Court commented on *Sonner* as follows:

> In *Sonner v. Premier Nutrition Corp.*, 971 F.3d. 834 (9th Cir. 2020), the Ninth Circuit held that a plaintiff "must establish that she lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL [*i.e.*, § 17200] and CLRA."  *Id.* at 844. Notably, the court pointed out that the plaintiff in *Sonner* sought "the same sum in equitable restitution as 'a full refund of the purchase price' . . . as she requested in damages to compensate her for the same past harm.  Sonner fails to explain how the same amount of money for the exact same harm is inadequate or

United States District Court
Northern District of California

incomplete . . . ." *Id.*

[Here,] it is not an unfair burden to require Plaintiffs to explain why legal remedies are inadequate in their pleading. *Gibson v. Jaguar Land Rover North America, LLC*, No. CV 20-00769-CJC(GJSx), 2020 U.S. Dist. LEXIS 168724 (C.D. Cal. Sept. 9, 2020) (stating that "courts generally require plaintiffs seeking equitable relief to allege some facts suggesting that damages are insufficient to make them whole"). **Here, Plaintiffs have failed to explain how restitution could be different from damages.** Plaintiffs have simply speculated that restitution and damages could be different (*e.g.*, as to disgorgement) – but even that speculation is questionable given that any profits subject to disgorgement under § 17200 would be limited. *See S. Cal. Water Co. v. Aerojet-General Corp.*, No. CV 02-6340 ABC (RCx), 2003 U.S. Dist. LEXIS 26534, at *44 (C.D. Cal. Apr. 1, 2003) (noting that "§ 17200 does not provide a remedy of nonrestitutionary disgorgement"; "[u]nder § 17200, restitution is limited to disgorgement of (1) money or property once in the plaintiff's possession and (2) money in which the plaintiff has a vested interest").

Finally, on the face of the complaint, it appears that what Plaintiffs' claim for damages and restitution are not really different. The FAC asserts Plaintiffs have been damaged because they "would have paid significantly less for [the televisions]" had they known the truth — or that they would not have purchased the televisions at all. FAC ¶ 120. The first measure is the same as what may be obtained as restitution. *See Brazil v. Dole Packaged Foods, LLC*, 12-cv-01831-LHK, 2014 U.S. Dist. LEXIS 157578 (N.D. Cal. Nov. 6, 2014 (stating that "[t]he proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received"). As for the second measure, some courts have held that a full refund of the purchase price is not even available as restitution, *see Victor v. R.C. Bigelow, Inc.*, 2015 U.S. Dist. LEXIS 106924 (N.D. Cal. Aug. 12, 2015) (stating that "[t]he law is clear in this District that '[t]he proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received, not the full purchase price or all profits'").

. . . . The Court dismisses the § 17200, § 17500, CLRA, and unjust enrichment claims to the extent they seek equitable relief because Plaintiffs have not demonstrated the inadequacy of a legal remedy. The dismissal, however, is without prejudice such that, should Plaintiffs uncover during discovery a basis for claiming that legal remedies do not provide for adequate relief, they may seek to amend.

*Julian v. TTE Technology, Inc.*, No. 20-cv-02857-EMC, 2020 U.S. Dist. LEXIS 215039, at *9-13

(N.D. Cal. Nov. 17, 2020); *see also Phan*, 2021 U.S. Dist. LEXIS 103629, at *14-16 (citing

*Julian*).

*Sonner* remains good law in the Ninth Circuit. *See, e.g.*, *Key v. Qualcomm Inc.*, 129 F.4th

1129, 1142 (9th Cir. 2025) (following *Sonner* in stating that, "where an adequate legal remedy

exists, federal courts are precluded from awarding equitable relief, at least in the form of equitable

restitution"; treble damages were available for plaintiffs' Cartwright Act claim – "hardly an

inadequate remedy" – and the fact that plaintiffs failed to prove that claim did not make the

remedy inadequate); *In re Apple Processor Litig.*, No. 22-16164, 2023 U.S. App. LEXIS 24257, at

*5-6 (9th Cir. Sept. 13, 2023) (holding that district court properly dismissed plaintiffs' equitable

claims because plaintiffs failed to comply with *Sonner* – *i.e.*, they "'fail[ed] to explain' how the

money they seek through restitution is any different than the money they seek as damages").

In light of *Sonner*, Plaintiffs face a significant problem to the extent they seek equitable

relief – in particular, *retrospective* equitable relief in the form of restitution.  Plaintiffs have not

explained how restitution would be any different from legal damages here.  *See, e.g.*, Compl. ¶¶

19, 27 (alleging that, for each Plaintiff, she "would not have purchased the Products or would have

purchased the Products on different terms had she known the truth about their contents").

Plaintiffs contend that they are free to plead alternative legal remedies but, as Polar notes,

"[a]lternative pleading is not an exception to the basic requirement of *Twombly* plausibility."

Reply at 8; *see also Phan*, 2021 U.S. Dist. LEXIS 103629, at *16 (rejecting the same basic

argument; noting that it was also rejected in *Julian*).  It does not adequately address the basic

question of whether legal remedies are inadequate.

Plaintiffs argue legal damages would not be an adequate remedy because (1) some of the

equitable claims (specifically, §§ 17200 and 17500) have a "longer statute of limitations" and

because (2) § 17200 covers "a broader scope of actionable conduct" ("not requir[ing], among

other things, that a reasonable consumer would have been deceived in order to establish a

violation"[4]).  Opp'n at 20.  Neither argument is convincing.

_____

[4] It is not entirely clear what Plaintiffs mean here.  Plaintiffs' complaint does not provide much
clarity:

> Broader Scope of Conduct.  The scope of actionable misconduct
> under the unfair prong of the UCL is broader than the other causes
> of action asserted herein.  The UCL creates a cause of action for
> violations of other laws (e.g., Sherman Law), which does not
> require, among other things, that a reasonable consumer would have

13

First, the Ninth Circuit has already rejected Plaintiffs' statute-of-limitations argument.

> [W]e reject [plaintiff's] argument that the federal inadequate-remedy-at-law principle should be limited to cases where an equitable claim and a legal claim have the same statute of limitations. Here, the UCL's statute of limitations is a year longer than that of the CLRA. Thus, [plaintiff] argues, they are not interchangeable, and the CLRA claim is not an adequate legal remedy. [Plaintiff] provides no relevant authority to support that position. Moreover, we have already determined in *Sonner* that the availability of a CLRA claim for damages precludes a UCL claim for equitable relief in federal court.

*Guzman v. Polaris Indus.*, 49 F.4th 1308, 1313 n.2 (9th Cir. 2022); *see also Huckaby v. CRST Exped., Inc.*, No. 2:21-cv-07766-ODW (PDx), 2025 U.S. Dist. LEXIS 63427, at *23 (C.D. Cal. Apr. 1, 2025) (concluding that, even though the UCL has a longer statute of limitations than the Labor Code, that does not mean "the existing remedy [under the Labor Code] is inadequate, 'only that additional damages may be available'"); *Scott v. Cintas Corp.*, No. 3:23-cv-05764-JSC, 2024 U.S. Dist. LEXIS 117954, at *23 (N.D. Cal. July 3, 2024) (stating that *Guzman* "indicates the longer statute of limitations under the UCL does not, on its own, make an equivalent legal claim inadequate").[5]

As for Plaintiffs' second argument, it also runs counter to *Guzman* – *i.e.*., because the

---

> been deceived in order to establish a violation. Thus, Plaintiff and Class members may be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the FAL requires actual or constructive knowledge of the falsity; the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct).

Compl. ¶ 60.

[5] Before *Guzman* (issued on September 29, 2022), some district courts did agree with Plaintiffs' argument. *See, e.g., Garcia v. Wal-Mart Stores, Inc.*, No. ED CV 16-01645 TJH, 2022 U.S. Dist. LEXIS 136291, at *10-11 (C.D. Cal. May 5, 2022) ("This Court agrees that the statute of limitations issue, as it relates to the adequacy of the legal remedy, here, is significant, particularly because if the class were to prevail on its UCL claim, it could, possibly, recover an additional year of unpaid overtime pay."); *Rivera v. Jeld-Wen, Inc.*, No. 21-cv-01816-AJB-AHG, 2022 U.S. Dist. LEXIS 142129, at *14 (S.D. Cal. Aug. 9, 2022) ("[T]he Court need only address whether a shorter statute of limitations, when pled in the context of an alternative remedy, renders a legal remedy inadequate as a matter of law. The Court finds it does.").

14

United States District Court
Northern District of California

1    Ninth Circuit stated that "we already determined in *Sonner* that the availability of a CLRA claim

2    for damages precludes a UCL claim for equitable relief in federal court."  *Guzman*, 49 F.4th at

3    1313 n.2.  Furthermore, Plaintiffs have not established that, *e.g.*, "unfair" conduct under the §

4    17200 could not be actionable under a legal claim, and, even if "unfair" conduct is technically less

5    rigorous than "unlawful" or "fraudulent" conduct, that would seem to have little traction in the

6    instant case given the facts alleged – *i.e.*, inherently, there would have to be something misleading

7    about the "100% Natural" label in order for it to be deemed "unfair."  At least in this case, the

8    scope of the claim for legal damages does not materially differ from that of the claim for

9    restitution.

10          The Court, therefore, dismisses any claims to the extent Plaintiffs seek retrospective

11   equitable relief because Plaintiffs have failed to allege that legal remedies are inadequate.

12          Injunctive relief, however, is a different matter (*i.e.*, *prospective* equitable relief).  To be

13   clear, *Sonner* still requires that Plaintiffs explain how legal remedies are inadequate in order to get

14   injunctive relief.  *See In re Macbook Keyboard Litig.*, No. 5:18-cv-02813-EJD, 2020 U.S. Dist.

15   LEXIS 190508, at *12 (N.D. Cal. Oct. 13, 2020) (agreeing with other courts that, "under *Sonner*,

16   Plaintiffs are required to allege that they lack an adequate remedy at law in order to seek

17   injunctive relief").  But the explanation is fairly clear: damages are inadequate because Plaintiffs

18   wish to address Polar's conduct (using the "100% Natural" label) *in the future*.  *See Linton v.*

19   *Axcess Fin. Servs.*, No. 23-cv-01832-CRB, 2023 U.S. Dist. LEXIS 113669, at *7 (N.D. Cal. June

20   30, 2023) ("Because retrospective monetary damages will not prevent the future harm only

21   remediable by an injunction ordering [defendant] to stop issuing loans with unfair interest rates,

22   the Court declines to extend *Sonner*'s inadequate-remedy-at-law requirement to [plaintiff's]

23   injunctive relief claim").  *Compare, e.g.*, *Macbook Keyboard*, 2020 U.S. Dist. LEXIS 190508, at

24   *12-13 ("Courts generally hold that monetary damages are an adequate remedy for claims based

25   on an alleged *product defect*, and reject the argument that injunctive relief requiring repair or

26   replacement is appropriate.") (emphasis added); *see also Church of Scientology v. U.S.*, 920 F.2d

27   1481, 1489 (9th Cir. 1990) (stating that "the opportunity to sue for a *[tax] refund* is an adequate

28   remedy at law which bars the granting of an injunction") (emphasis added).

1    Implicitly acknowledging such, Polar raises a secondary argument – specifically, that

2    Plaintiffs lack standing to seek injunctive relief.  According to Polar, Plaintiffs have not plausibly

3    alleged "future risk of injury" because "the complaint effectively alleges that Plaintiffs will not

4    repurchase, since it firmly declares they would not have purchased the products if they knew then

5    what they (claim to) know now.  Even if they purchase again, they are now wise to [the] alleged

6    deception and cannot be so deceived anew."  Mot. at 17-18.  But this argument lack merit under

7    *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2017).  In *Davidson*, the Ninth Circuit

8    held that

9            a previously deceived consumer may have standing to seek an
10           injunction against false advertising or labeling, even though the
             consumer now knows or suspects that the advertising was false at
11           the time of the original purchase, because the consumer may suffer
             an "actual and imminent, not conjectural or hypothetical" threat of
12           future harm.  *Knowledge that the advertisement or label was false in
             the past does not equate to knowledge that it will remain false in the
13           future.*  In some cases, the threat of future harm may be the
             consumer's plausible allegations that she will be *unable to rely on
14           the product's advertising or labeling in the future, and so will not
             purchase the product although she would like to.*  In other cases, the
15           threat of future harm may be the consumer's plausible allegations
             that she might purchase the product in the future, despite the fact it
16           was once marred by false advertising or labeling, as she may
             reasonably, but incorrectly, assume the product was improved.
17           Either way, we share one district court's sentiment that we are "not
             persuaded that injunctive relief is never available for a consumer
18           who learns after purchasing a product that the label is false."

19           We observe – although our conclusion is not based on this
             consideration – that our holding alleviates the anomalies the
20           opposite conclusion would create.  As the *Machlan* court aptly
             recognized, "[a]llowing a defendant to undermine California's
21           consumer protection statutes and defeat injunctive relief simply by
             removing a case from state court is an unnecessary affront to federal
22           and state comity [and] . . . an unwarranted federal intrusion into
             California's interests and laws."  This is because "the primary form
23           of relief available under the UCL to protect consumers from unfair
             business practices is an injunction" – a principle the California
24           Supreme Court recently reaffirmed.

25   *Id.* at 969-70 (emphasis added).

26           In its papers, Polar acknowledges the Ninth Circuit holding in *Davidson* but argues that it

27           does not save Plaintiffs' injunctive or declaratory demands because
             they allege no imminent desire to repurchase the products, let alone
28           plausibly.  Barring themselves from the narrow refuge that *Davidson*

United States District Court
Northern District of California

1    opened, they effectively admit they will not repurchase until the
     alleged deception is cured to their satisfaction, and even then, they
2    might or might not.

3    Mot. at 18.  The Court is not convinced.  Each Plaintiff alleges that she believed the "100%

4    Natural" label to mean no synthetics, *see* Compl. ¶¶ 16, 24, and that, if she "has occasion to

5    believe that [Polar's] marketing and labeling is truthful, non-misleading, and lawful, she would

6    purchase Polar Seltzers in the future."  Compl. ¶¶ 21, 29.  They further allege that they "would be

7    willing to purchase Defendant's Seltzers again in the future should they be able to rely on

8    Defendant's marketing as truthful and non-deceptive."  Compl. ¶ 76.  This is enough to constitute

9    the kind of cognizable future injuries contemplated in *Davidson*; Polar's argument to the contrary

10   is nitpicking and fails to recognize that all reasonable inferences should be made in Plaintiffs'

11   favor at this juncture in the proceedings.

12        Polar's attempt to get around *Davidson* by citing *In re Coca-Cola Products Marketing &*

13   *Sales Practices Litigation (No. II)*, No. 20-15742, 2021 U.S. App. LEXIS 26239 (9th Cir. Aug. 31,

14   2021), is unavailing.  In *Coca-Cola*, the Ninth Circuit stated:

15        *Davidson* offered two non-exclusive examples of threatened future
          harm a consumer complaining of assertedly false labeling might
16        plausibly allege: "she will be unable to rely on the product's
          advertising or labeling in the future, and so will not purchase the
17        product although she would like to" and "she might purchase the
          product in the future, despite the fact it was once marred by false
18        advertising or labeling, as she may reasonably, but incorrectly,
          assume the product was improved."  In *Davidson*, the plaintiff
19        contended that Kimberly-Clark falsely labeled its wipes as
          "flushable" and alleged that she "would purchase truly flushable
20        wipes," a "desire . . . based on her belief that 'it would be easier and
          more sanitary to flush the wipes than to dispose of them in the
21        garbage.'"  The alleged harm, "her inability to rely on the validity of
          the information advertised on Kimberly-Clark's wipes," was
22        particular to Davidson, who would be affected "in a personal and
          individual way" because of her desire to purchase the product as
23        advertised.  And at the motion to dismiss stage, her plausible
          allegations that she "would purchase truly flushable wipes
24        manufactured by Kimberly-Clark if it were possible" made the
          informational injury she suffered concrete.

25

26        None of the plaintiffs in this case allege a desire to purchase Coke *as
          advertised*, that is, free from what they believe to be artificial flavors
27        or preservatives, nor do they allege in any other fashion a concrete,
          imminent injury.  Instead, as Plaintiffs explained in their brief, they
28        have "each stated that if Coke were properly labeled, they would
          consider purchasing it."  Under governing law, such an abstract

United States District Court
Northern District of California

1

> interest in compliance with labeling requirements is insufficient,
> standing alone, to establish Article III standing.  Moreover, the
> imminent injury requirement is not met by alleging that the plaintiffs
> would consider purchasing Coke.

2

3   *Id.* at *3-4 (emphasis in original).  Apart from the fact that *Coca-Cola* is not binding authority, the

4   instant case is distinguishable from *Coca-Cola* because it can reasonably be inferred from the

5   complaint that Plaintiffs do desire to purchase Polar seltzer water as advertised ("100% Natural").

6   To be sure, Polar indicates that its seltzer water no longer bears the "100% Natural" label, but that

7   is outside the four corners of the complaint.

8   D.     Claim for Unjust Enrichment

9          Based on the *Sonner* analysis above, the Court dismisses the unjust enrichment claim.  The

10  claim is deficient under *Sonner* because the only relief sought by Plaintiffs for the unjust

11  enrichment claim is restitution and Plaintiffs have not shown how legal damages are inadequate in

12  order to get such equitable relief.  *See* Compl. ¶ 151 ("As a direct and proximate result of

13  Defendant's unjust enrichment, Plaintiffs and the Class are entitled to restitution or restitutionary

14  disgorgement in an amount to be proved at trial.").  In light of this ruling, the Court need not

15  entertain any other argument made by Polar challenging the unjust enrichment claim.  However,

16  the Court does address briefly one of Polar's contentions.

17         Specifically, if the unjust enrichment claim is based on California law alone (as indicated

18  by Plaintiffs' opposition), Plaintiffs have failed to explain how California law can apply to a

19  nationwide class – in particular, for any Plaintiff or class member who lives outside of California

20  *and* purchased seltzer outside of the state.  There would not appear to be any California connection

21  justifying application of California law, especially since Polar is alleged to be a Massachusetts

22  corporation with its principal place of business in Worcester, Massachusetts.  *See* Compl. ¶ 12.

23  *See generally People ex rel. DuFauchard v. U.S. Financial Management, Inc.*, 169 Cal. App. 4th

24  1502, 1517 (2009) (presumption against extraterritoriality applies to attempts to enforce California

25  law against conduct that occurs outside of California).

26  E.     Claim for Breach of Warranty Under New York Law

27         Polar challenges next Plaintiffs' claim for breach of express warranty.  As indicated above,

28  Plaintiffs state in their complaint that the express warranty claim is based on both violations of

United States District Court
Northern District of California

1   New York law and California law.  (They do not make clear whether they are asserting a

2   nationwide class or only New York and California subclasses.)  According to Polar, the claim

3   predicated on New York law, *see* N.Y. CLS UCC §§ 2-313,[6] is flawed because direct privity is a

4   requirement for the claim and Plaintiffs cannot assert direct privity since they made purchases

5   from grocery stores.  *See* Mot. at 12.  In response, Plaintiffs contend that there are exceptions to

6   the general rule requiring privity, and "[o]ne such exception" is when there are

7   "misrepresentations contained in 'public advertising or sales literature.'"  Opp'n at 12.

8           Plaintiffs have the better argument, for the reasons articulated by the New York district

9   court in *Cohen v. Nutricost*, 747 F. Supp. 3d 467 (E.D.N.Y. 2024).  In *Cohen*, the court

10  acknowledged the "split between New York appellate courts and the Second Circuit as to whether

11  privity is a required element of a breach of express warranty claim under New York law."  *Id.* at

12  482.  The state appellate courts have held that privity is *not* required – specifically, "for claims that

13  solely allege economic loss where the defendant allegedly made specific representations in

14  advertising and sales literature upon which plaintiffs relied," *id.* – based on a 1962 decision from

15  the New York Court of Appeals (the highest court), *i.e.*, *Randy Knitwear, Inc. v. A. Cyanamid Co.*,

16  11 N.Y.2d 5 (1962).

17              The New York Court of Appeals dispensed with the privity
                requirement for breach of express warranty claims "by a remote
18              purchaser against a manufacturer" where the plaintiff alleged only
                economic loss and where the manufacturer is alleged to have

19

20  _____

    [6] Section 2-313 provides in relevant part that express warranties are created by a seller under the
21  following circumstances:

22              (a)     Any affirmation of fact or promise made by the seller to the
                        buyer which relates to the goods and becomes part of the
23                      basis of the bargain creates an express warranty that the
                        goods shall conform to the affirmation or promise.

24
                (b)     Any description of the goods which is made part of the basis
25                      of the bargain creates an express warranty that the goods
                        shall conform to the description.

26
                (c)     Any sample or model which is made part of the basis of the
27                      bargain creates an express warranty that the whole of the
                        goods shall conform to the sample or model.

28  N.Y. CLS UCC § 2-313(1).

                                            19

1

"induced the purchase by representing the quality of the goods in public advertising and on labels which accompanied the goods." The New York Court of Appeals reasoned that a manufacturer who has "invited and solicited the use" of its product "should not be permitted to avoid responsibility by claiming that he made no contract directly with the user."

2

3

4  *Cohen*, 747 F. Supp. 3d at 482.  In contrast, the Second Circuit reached a different conclusion

5  (resolving a split among New York district courts) in *MacNaughton v. Young Living Essential*

6  *Oils, LC*, 67 F.4th 89 (2d Cir. 2023).

7       The *Cohen* court, however, noted that

8          the Second Circuit in *MacNaughton* did not address or analyze the commentary to Sections 2-313 and 2-318 suggesting that the holding of *Randy Knitwear* remains good law even after the adoption of the N.Y. U.C.C.  *See* N.Y. U.C.C. § 2-313, Official Cmt. 2 (explaining that "the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties *need not be confined either to sales contracts or to the direct parties to such a contract*") (emphasis supplied); N.Y. U.C.C. § 2-318, N.Y. Annotations ("In no way is the [N.Y. U.C.C.] intended to limit the extension of warranty protection by the courts to a greater number of plaintiffs or the expansion of the manufacturer's liability as in *Randy Knitwear*.").

9

10

11

12

13

14

15          Additionally, the Second Circuit's analysis of the direct marketing and sealed container exceptions to the privity requirement [which it found inapplicable] was limited to affirming the district court's reasoning – but the district court considered those exceptions in the context of evaluating the plaintiff's claims for breach of *implied* warranty, not for breach of express warranty – the claim at issue in this case.

16

17

18

19  *Cohen*, 747 F. Supp. 3d at 483 (emphasis in original).

20       The *Cohen* court acknowledged that it was ordinarily bound by Second Circuit decisions

21  but not here as

22          [d]iversity cases involving a state law claim present an exception to [the] general rule "because the ultimate source for state law adjudication in diversity cases is the law as established by the constitution, statutes, or authoritative court decisions of the state." *Id.* at 101.  In such cases, a court is "bound to apply New York law as determined by the New York Court of Appeals even when a decision of the New York Court of Appeals conflicts with [Second Circuit] precedent."  *Id.*

23

24

25

26

27  *Id.* at 484 (quoting *Glob. Reins. Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 100 (2d Cir.

28  2021); *see also Maroney v. Woodstream Corp.*, No. 19-CV-8294 (KMK), 2025 U.S. Dist. LEXIS

59537, at *31 n.7 (S.D.N.Y. Mar. 28, 2025) (following the analysis in *Cohen* in spite of *MacNaughton*).  *But see Stern v. Electrolux Home Prods., Inc.*, No. 22-CV-3679 (JMA)(ARL), 2024 U.S. Dist. LEXIS 17004, at *32 (E.D.N.Y. Jan. 30, 2024) (indicating that it was bound by *MacNaughton*).

In the case at bar, there is even less reason to follow *MacNaughton* because this Court is not bound by Second Circuit case law.  *See also Weisblum v. Prophase Labs, Inc.*, No. 14-CV-3587 (JMF), 2015 U.S. Dist. LEXIS 20634, at *24-25 n.3 (S.D.N.Y. Feb. 20, 2015) (declining to follow pre-*MacNaughton* district court cases cited by defendant because "neither court acknowledged the exception for representations made in advertising and sales literature (perhaps because the plaintiffs in those cases did not rely on it)").  This Court is free to analyze New York law as best indicated by the state's appellate courts.

The Court therefore rejects Polar's argument on the New York warranty claim.  Nevertheless, the warranty claim is dismissed without prejudice for the reasons stated above in Part II.B.

F.    Punitive Damages

Polar's next assertion is that any claim for punitive damages must be dismissed.  For the New York-based claims, Polar contends that punitive damages are not available at all.  For the California-based claims (in particular, the CLRA claim), Polar asserts that punitive damages are available only if the requirements of California Civil Code § 3294(a) are satisfied – *i.e.*, there must be oppression, fraud, or malice on the part of the defendant and, if the defendant is a company, the misconduct must have been engaged in by an officer, director, or managing agent.

To the extent Plaintiffs argue that the Court should outright reject Polar's argument because a motion to dismiss is not the proper procedural vehicle to challenge the punitive damages claim, courts have disagreed.  *See, e.g.*, *Gopinath v. Somalogic, Inc.*, No. 23-cv-1164-W-WVG, 2023 U.S. Dist. LEXIS 146816, at *16-17 (S.D. Cal. Aug. 21, 2023) (noting that, in *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970 (9th Cir. 2010), the Ninth Circuit stated that a challenge to punitive damages "on the grounds that it is precluded as a matter of law" is "'better suited for a Rule 12(b)(6) motion or a Rule 56 motion, not a Rule 12(f) motion'"; but some courts have

United States District Court
Northern District of California

interpreted this to mean that Rule 12(b)(6) can be used to challenge the sufficiency of a punitive damages claim, others have held more narrowly that a 12(b)(6) motion can be brought *only* where a defendant contends damages are precluded as a matter of law, and still others have held that 12(b)(6) is never appropriate because punitive damages constitute a remedy and not a claim). The Court agrees with the reasoning in *Gopinath* that a motion to dismiss can be used to challenge Plaintiffs' claim for punitive damages at least where the availability of punitive damages can be decided as a matter of law. As for the merits, Plaintiffs do not address Polar's contention that punitive damages are not available under New York law – even though, in their complaint, Plaintiffs expressly invoked punitive damages for their claims for breach of express warranty and for violation of New York's Consumer Protection from Deceptive Acts and Practices Law (N.Y. Gen. Bus. Law §§ 349-50). *See* Compl. ¶¶ 95, 140, 146. Because Plaintiffs have not expressly addressed punitive damages under New York law in response to Polar's motion, the Court deems any opposition waived.[7]

As for California law, Plaintiffs argue that they have alleged fraud throughout their complaint – which is fair. It is also a fair inference that a "higher up" in Polar had to approve the "100% Natural" label in order for the label to be placed on the seltzer water product.[8]

Accordingly, the Court dismisses the claim for punitive damages under New York law (based on a waiver by Plaintiffs), but the claim for punitive damages under California law is not dismissible at this stage – but for the fact that there are the deficiencies described above with all causes of action on the merits, as asserted in the complaint. *See* Part II.B, *supra*.

---

[7] Plaintiffs would also seem to face an uphill battle on punitive damages under New York law. *See, e.g.*, *Hobish v. AXA Equit. Life Ins. Co.*, 2025 N.Y. LEXIS 38, at *13 (N.Y. Ct. App. Jan. 14, 2025) (stating that "[t]he bar for subjecting a defendant to punitive damages on a contract claim is high"); id. at *16-17 ("holding that punitive damages for section 349(h) claims are limited to the treble damages provided by the statute").

[8] Polar also makes a passing argument that any claim for punitive damages is premature because Plaintiffs do not have yet a claim for compensatory damages. *See* Compl. ¶ 135 ("In conjunction with this lawsuit Plaintiff served a CLRA demand pursuant to Civil Code §1782, via U.S. Certified Mail Return Receipt notifying Defendant of the conduct described herein and that such conduct was in violation of particular provisions of Civil Code §1770. If 30 days pass without Defendant providing the requested class-wide relief, Plaintiff will amend the Complaint to seek damages as provided under Civil Code §1780."). Plaintiffs' complaint was filed in early March 2025. Thus, by this time, there is no issue of ripeness.

G.     Standing

Finally, Polar makes three standing arguments that affects various claims.

1.     Nationwide Class

Polar's first standing argument relates to Plaintiffs' assertion of a nationwide class. Plaintiffs have asserted a nationwide class for the claim for unjust enrichment. All other claims are based on a state subclass (California or New York), except for possibly the claim for breach of express warranty. As noted above, for the warranty claim, Plaintiffs have not made clear whether that is a nationwide class claim – either in the complaint or even now in their opposition. For purposes of this order, the Court assumes Plaintiffs are asserting a nationwide class for the warranty claim as well.

Polar argues that the assertion of a nationwide class should be rejected because, under a choice-of-law analysis, California law cannot apply across the board; rather the laws of the different jurisdictions where the consumers made their purchases apply. Polar then contends that Plaintiffs – who are from California and New York – only have standing to assert California and New York claims. Finally, Polar acknowledges that there is case law suggesting that the issue here is not so much related to standing as class certification. *See, e.g.*, *Phan*, 2021 U.S. Dist. LEXIS 103629, at *36-37 (indicating agreement with a district court's analysis that, when a defendant is not challenging a plaintiff's standing to bring their *own* claims but rather their standing to bring claims *on behalf of the class*, the issue is a class certification issue); *Sultanis v. Champion Petfoods U.S. Inc.*, 21-cv-00162-EMC, 2021 U.S. Dist. LEXIS 145293, at *22 (N.D. Cal. Aug. 3, 2021) (stating that "whether a plaintiff can bring claims on behalf of unnamed plaintiffs under the laws of states in which the named plaintiff does not reside or was injured is a matter of typicality, adequacy, and predominance under Rule 23, not Article III standing"). But Polar maintains that, even under a Rule 23 analysis, the nationwide (or multistate) class should be rejected for two reasons: (1) because the laws of the various states differ on unjust enrichment and express warranty, Plaintiffs have no standing to bring claims on behalf of the class and (2) because the laws of the various states differ, a class would not be manageable. Polar argues this class issue can be resolved at 12(b)(6) instead of waiting for class certification. *See Sultanis*, 2021 U.S. Dist.

1    LEXIS 145293, at \*22-23, 26 (stating that, "[j]ust because this question does not involve Article

2    III standing does not mean that the Court does not have discretion to conclude at the pleadings

3    stage that [plaintiff] does not satisfy the adequacy, typicality, or predominance requirements to

4    bring claims on behalf of unnamed plaintiffs in multiple other states where she does not reside or

5    where she did not purchase the Products"; taking into account that waiting for class certification

6    would mean nationwide discovery); *Phan*, 2021 U.S. Dist. LEXIS 103629, at \*19 (noting that,

7    "[i]f the issue is purely legal in nature, then it may make little sense not to wait until class

8    certification proceedings to resolve it given the burdens class certification and other class-related

9    discovery imposes on the parties").

10    Plaintiffs do not have much of a response to Polar's arguments.  They contend that the

11    issue of choice of law should wait for class certification but the case law cited above reflects that

12    choice of law may be evaluated at the pleading stage, particularly if based on matters of law which

13    are clear.  Plaintiffs also argue Polar has failed to show, in the choice-of-law analysis, that "the

14    conflict among state laws is so significant as to preclude application of California law."  Opp'n at

15    18.  But they do not address the fact that, as explained in *Phan*, there are material differences in

16    both unjust enrichment law and express warranty law across the states, and this Court in *Pham*

17    thus rejected the nationwide class claims based on those causes of action.  *See Phan*, 2021 U.S.

18    Dist. LEXIS 103629, at \*20-21 (pointing out that, "in *Mazza*, the Ninth Circuit expressly noted

19    that '[t]he elements necessary to establish a claim for unjust enrichment . . . vary materially from

20    state to state'"); *id.* at 25-26 (citing cases where courts have found "material differences in state

21    law" on express warranty – *e.g.*, privity, notice, and reliance requirements).  Nothing can be

22    gained by awaiting resolution of this issue for class certification;  the analysis is clear, and the

23    Court rules consistent with *Pham*.

24    The Court, therefore, strikes the nationwide class allegations made by Plaintiffs, for the

25    unjust enrichment claim as well as the warranty claim.  Of course, as discussed above, the unjust

26    enrichment claim is also dismissed on the merits.  *See* Part II.C, *supra*.

27    2.    Products Not Purchased by Plaintiffs

28    The next standing argument made by Polar is similar to one of the arguments that Polar

United States District Court
Northern District of California

United States District Court
Northern District of California

1   made above. According to Polar, Plaintiffs have failed to show how they have standing to

2   challenge seltzer water flavors that they did *not* purchase. Polar contends that, although this

3   deficiency could potentially be corrected by establishing a similarity across the seltzer water

4   products, Plaintiffs did not allege any such similarity in their complaint. *See* Mot. at 15-16.

5   Polar's argument here is similar to one of the arguments it made above – *i.e.*, that Plaintiffs'

6   claims are deficient because they have not alleged that there was testing of flavors they purchased

7   or that the flavors tested are somehow representative.

8       For similar reasons, Polar's standing argument has merit. Plaintiffs' response in their

9   opposition is not satisfactory. They seem to argue that there is similarity by virtue of the fact that

10  the seltzer water – regardless of flavor – has "the same two ingredients (water and natural

11  flavors)." Opp'n at 17. But as Polar points out, as a facial matter, the flavors seem to be quite

12  different. *See* Mot. at 17 (taking note of the various flavors cited in the complaint – *e.g.*, lime,

13  black cherry, ruby red grapefruit, blackberry, orange vanilla, lemon). And it is especially

14  problematic for Plaintiffs not to address this difference given their position that the source of the

15  synthetics in the seltzer water *comes from the flavoring*. The presence of synthetics may vary

16  among flavors.

17      Plaintiffs cite cases where court have found similarity even though a product comes in

18  different flavors but those cases are distinguishable – *i.e.*, the plaintiff was not making a claim that

19  a product's label of "Natural" or "100% Natural" was false because the flavors used in the product

20  all inherently contained synthetics. *See, e.g.*, *Swearingen v. Late July Snacks LLC*, No. 13-cv-

21  04324-EMC, 2017 U.S. Dist. LEXIS 170928, at *1 (N.D. Cal. Oct. 16, 2017) ("This case arises

22  out of Defendant Late July Snacks LLC's use of the term 'evaporated cane juice' on certain

23  multigrain chip and cracker products."); *Avoy v. Turtle Mt., LLC*, No.: 13-CV-0236-LHK, 2014

24  U.S. Dist. LEXIS 19241, at *2-3 (N.D. Cal. Feb. 14, 2014) ("Avoy argues that the Purchased

25  Products are 'misbranded' because the labels list 'organic dehydrated cane juice' or 'organic

26  evaporated cane juice' as an ingredient."); *Swartz v. Dave's Killed Bread, Inc.*, No. 4:21-cv-

27  10053-YGR2023 U.S. Dist. LEXIS 41302, at *1 (N.D. Cal. Jan. 9, 2023) ("In this putative class

28  action, plaintiff alleges defendants misrepresent the quantity and quality of protein in some of their

1    products.").

2        In their opposition, Plaintiffs also suggest that, between the two of them, "it is likely that

3    every flavor" was purchased.  Opp'n at 16.  But Plaintiffs do not make that specific allegation in

4    their complaint and thus it cannot be credited.

5        3.    Injunctive Relief

6        Finally, Polar argues that Plaintiffs have failed to allege standing for injunctive (or

7    declaratory) relief.  This argument has already been addressed above in Part II.C, *supra*

8    (discussing, *inter alia*, the Ninth Circuit's *Davidson* case).  In short, Polar's standing argument

9    lacks merit.

10                    **III.    CONCLUSION**

11       For the foregoing reasons, the Court grants Polar's motion to dismiss, but gives Plaintiffs

12   leave to amend.

13   •   All of Plaintiffs' claims are deficient because they have not sufficiently alleged

14       what flavors of seltzer water were tested, whether the flavors tested included those

15       purchased by Plaintiffs, whether the flavors tested are representative (suggesting a

16       systemic problem with the product), and, ultimately, which flavors contain which

17       synthetics.  Plaintiffs have also identified at most only one synthetic in the product

18       and not identified which flavors contain that synthetic.

19   •   The claims seeking equitable relief are also problematic to the extent they seek

20       retrospective relief – *i.e.*, restitution.  Plaintiffs have not sufficiently alleged why a

21       legal remedy would be inadequate.  This problem infects at least the claims for

22       violation of §§ 17200 and 17500 and unjust enrichment – plus, *e.g.*, the CLRA

23       claim which includes a request for equitable relief.  Although Plaintiffs still have a

24       basis to seek prospective equitable relief – *i.e.*, an injunction – Plaintiffs do not

25       seek injunctive relief for the unjust enrichment claim.

26   •   The unjust enrichment claim is also a problem to the extent Plaintiffs are basing

27       that claim on California law (applying across the board to a nationwide class).

28       Plaintiffs have not explained how California law can apply if a plaintiff or class

United States District Court
Northern District of California

26

1    member lives outside of California *and* purchased seltzer outside the state.  There is

2    no connection to California justifying application of California law, especially

3    since Polar is allegedly a Massachusetts corporation with a principal place of

4    business in Massachusetts.  California law does not apply to purchases made

5    outside of California.

6    •    The Court agrees with that direct privity is not a requirement for the warranty claim

7        under New York law, but that claims is flawed for independent reasons.

8    •    Plaintiffs have waived punitive damages for the New York-based claims.  For the

9        California-based claims, the issue of punitive damages is premature to the extent

10       the claims are deficient for the reasons stated above.

11   •    Plaintiffs are barred from asserting a nationwide class, even though the Court is

12       permitting amendment.

13       Plaintiffs may file their amended complaint by September 22, 2025.  Although the Court is

14   allowing Plaintiffs to amend, their amendment cannot contravene the Court's rulings above that

15   prohibit Plaintiffs (1) from seeking retrospective equitable relief in the form of restitution, (2)

16   from asserting a nationwide class for the unjust enrichment and warranty claims, and (3) from

17   seeking punitive damages for the New York-based claims.  If Plaintiffs do not amend, then this

18   case shall automatically be dismissed with prejudice.  If Plaintiffs do amend, the Court directs the

19   parties to meet and confer to reach a stipulation on a reasonable time for Polar to respond to the

20   amended pleading, whether by answer or motion.

21       This order disposes of Docket No. 17.

22       **IT IS SO ORDERED**.

24   Dated: July 28, 2025

                                    _____
                                    EDWARD M. CHEN
                                    United States District Judge