UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STACY GRADNEY, et al.,

　　　　　Plaintiffs,

　　v.

POLAR BEVERAGES,

　　　　　Defendant.

Case No.  25-cv-02149-EMC

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

Docket No. 43

Plaintiffs Stacy Gradney and Sharon Toll have filed suit against Defendant Polar Beverages.  They allege that Polar has breached its warranty and violated consumer protection law (under New York and California state law) by labeling certain flavors of its seltzer water as "100% Natural" even though those flavors contain synthetic ingredients.  Previously, the Court granted Polar's motion to dismiss but gave Plaintiffs leave to amend.  *See* Docket No. 30 (order). Plaintiffs filed a first amended complaint ("FAC"), and Polar now moves to dismiss that pleading. Having considered the parties' briefs as well as the oral argument of counsel, the Court hereby **GRANTS** Polar's motion but gives Plaintiffs leave to amend.

## I.　　FACTUAL & PROCEDURAL BACKGROUND

In the operative FAC, which includes an expert declaration as an attachment, Plaintiffs allege as follows.

Polar is a company that manufactures and sells a line of seltzer water products.  The seltzers are sold in a variety of flavors – *e.g.*, lime, cranberry lime, black cherry, ginger lime mule, ruby red grapefruit, and blackberry mango.  *See* FAC ¶ 2; FAC ¶ 7 n.1.  Regardless of flavor, the packaging for the seltzer water bears the label "100% Natural."  *See* FAC ¶ 3.  The ingredients

listed are also the same: water and "natural flavors."  *See* FAC ¶ 5.

Although Polar claims the seltzers are "100% Natural," the products, in fact, are not because they "contain a material amount of synthetic ingredients."  FAC ¶ 6; *see also* FAC ¶¶ 40-41 (alleging that "a reasonable consumer would understand the phrase '100% Natural' on a Product's label to convey that the Product is devoid of artificial/synthetic ingredients" and that "[t]his understanding is consistent with [the] FDA which considers 'natural' to mean nothing artificial or synthetic is included in, or has been added to, the product that would not normally be expected to be there").  Because water is natural, the synthetic ingredients are found in the natural flavors.  *See* FAC ¶ 10.  Contrary to what its name suggests, "natural flavors" – as that term is defined in FDA regulations, *see* FAC ¶ 45 (citing 21 C.F.R. § 101.22(a)(3) – can, in fact, contain synthetic ingredients.

> In elemental terms, a natural flavor is anything that can be extracted from an animal or plant source.  It is called "natural" because the *original source* of the flavor additive is not manmade[,] . . . [but, even if] originating from a single natural source, the *finalized* flavor can contain as many as 250 chemically identified constituents, some of which are artificial and synthetic.

FAC ¶ 46 (emphasis added); *see also* FAC ¶ 47 (noting that something can qualify as a "natural flavor" even if it has some constituent components that are artificial or synthetic – *i.e.*, has non-natural ingredients).  Here, Plaintiffs challenge not the term "natural flavors" as used in Polar's ingredient list, but more specifically the term "100% Natural" which appears on (or at least used to appear on) the packaging.

As alleged, Plaintiffs conducted tests which showed that at least two flavors of Polar's seltzers – cranberry lime and ruby red grapefruit – contain synthetic ingredients.  *See* FAC ¶¶ 7, 9 (noting that six flavors were tested overall).  The first test was radiocarbon testing, which is "one of the most definitive analytical methods for distinguishing between natural and synthetic materials (*e.g.*, those derived from petrochemicals)."  Compl. ¶ 57.  If an item is found to be "100% Biobased Carbon," that indicates it is "entirely sourced from plants or animals," and therefore is fairly deemed 100% natural.  *See* Compl. ¶ 7.  "Conversely, any result less than 100% Biobased Carbon indicates the presence of synthetics (*i.e.*, petrochemicals) in the Product."

Compl. ¶ 7. Testing for cranberry lime showed that it was 27% synthetic; testing for ruby red grapefruit showed that it was 28% synthetic. *See* Compl. ¶ 9.

The second test was Gas Chromatography Mass Spectrometry ("GCMS"). "The GCMS identified the following sub-components (ethyl butyrate, octanal, limonene, linalool, α-terpineol, ethyl acetate, isoamyl alcohol, isoamyl acetate, ethyl 2-methylbutyrate, 1,4-cineol[1]) as the most significant constituents in the natural flavors used by [Polar]" – *i.e.*, they are the ingredients used in the natural flavors. FAC ¶ 11. Notably, these ingredients are all "available in both natural **and** synthetic versions." Keranen Decl. ¶ 4 (expert declaration attached to FAC) (emphasis added); *see also* Opp'n at 11 (providing an example: "[e]thyl butyrate may be extracted from fruits such as pineapples or oranges or may be chemically synthesized (typically by reacting ethanol with butyric acid"); *cf. Trammell v. Albertsons Co.*, No. 24-cv-00862-AJB-AHG, 2024 U.S. Dist. LEXIS 241572, at *3 (S.D. Cal. Nov. 25, 2024) (taking note of plaintiff's allegations that (1) malic acid can be derived from natural fruit sources but, if so, it is expensive and generally cost prohibitive to use in mass-produced foods and beverages and (2) malic acid is also available in a synthetic version, which is derived from a petroleum substrate and other synthetic components). However, Plaintiffs maintain that at least one of these ingredients (possibly more) must be synthetic because of the radiocarbon testing results. *See* Keranen Decl. ¶ 4.

Plaintiffs admit that they cannot determine which specific ingredients in the natural flavors are in fact synthetic. They maintain that they cannot do so without more information that is "held exclusively" by Polar and/or its flavor formulator (*i.e.*, the company that provides the natural flavors to Polar). FAC ¶ 11. As stated by Plaintiffs' expert, "the exact determination of the synthetic compound or compounds requires information regarding the ingredient sources, specifications, manufacturing process, and composition of the commercial flavor concentrate."[2]

---

[1] Eight of these ten ingredients "were common to both flavors." Opp'n at 8.

[2] Polar correctly points out that Plaintiffs have dropped from the FAC the theory that the "100% Natural" label is false because the seltzer water products contain the "known" synthetic ocimene quintoxide. This is the theory that the Court had previously indicated could pass muster. See Docket No. 30 (Order at 6) ("Polar suggests it is too conclusory to say that ocimene quintoxide is a 'known synthetic' – i.e., more of an explanation is needed as to why it is not natural. But that is nitpicking. It can reasonably be inferred that ocimene quintoxide is never a natural substance

3

Keranen Decl. ¶ 4.

Based on, *inter alia*, the above allegations, Plaintiffs have asserted the following causes of action against Polar (on behalf of New York and California subclasses). They are as follows:

(1) Breach of express warranty based on New York and California law.

(2) Violation of the California Consumer Legal Remedies Act. *See* Cal. Civ. Code § 1750 *et seq.*

(3) Violation of New York's Consumer Protection from Deceptive Acts and Practices Law. *See* N.Y. Gen. Bus. Law § 349 *et seq.*

(4) Violation of New York's Consumer Protection from Deceptive Acts and Practices Law. *See* N.Y. Gen. Bus. Law § 350 *et seq.*

## II. DISCUSSION

A. Legal Standard

To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

given the use of the word 'known.'").

United States District Court
Northern District of California

Because Plaintiffs are essentially claiming false advertising here, Rule 9(b) is also implicated.  Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

> To satisfy this requirement, a pleading must identify "the who, what, when, where, and how of the misconduct charged," as well as "what is false or misleading about [the purportedly fraudulent] statement, and why it is false."  This heightened pleading standard serves two main purposes.  First, allegations of fraud "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."  Second, the rule serves "to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis."

*United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018).

B.   Synthetic Ingredients

Polar argues first that all claims should be dismissed because Plaintiffs have failed to identify which ingredients contained in the seltzers at issue are synthetic.  Polar contends that this is a matter of fair notice – *i.e.*, it cannot defend itself without knowing specifically which of the ten ingredients in the natural flavors are allegedly synthetic.

While Polar's position is not entirely without any merit, the Court is not convinced.  Although Polar cites a number of cases where a court has dismissed a plaintiff's claims for failure to identify what the allegedly offending substance is, *see* Mot. at 5-6 (citing cases), they are distinguishable.  They do not address the situation here: where an ingredient can be extracted from a natural substance such as a fruit *or* chemically synthesized.  *See* Opp'n at 11 (providing an example: "[e]thyl butyrate may be extracted from fruits such as pineapples or oranges or may be chemically synthesized (typically by reacting ethanol with butyric acid").  And here, Plaintiffs have at least narrowed down the compounds in each flavor that could be synthetic to a relatively small finite set.  Furthermore, Polar does not suggest that Plaintiffs *could* do more testing to determine whether a specific ingredient in the seltzers is in its natural or non-natural form.  Taking

into account the totality of the circumstances, the Court concludes that Plaintiffs' narrowing of this case to two flavors and ten ingredients – at least one of which is synthetic – provides sufficient fair notice to Polar. *See Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1248 (10th Cir. 2008) ("[T]he degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context: 'Context matters in notice pleading. Fair notice under Rule 8(a)(2) depends on the type of case. . . .'").[3]

That being said, even if fair notice is not an issue, there is a more fundamental problem with Plaintiffs' complaint. Plaintiffs have failed to adequately explain their theory of falsity, that is, why any of the ingredients are "synthetic" rather than "natural." Plaintiffs primarily rely on the radiocarbon testing in support of their position that there are synthetic ingredients in the seltzer flavors at issue. In its prior order, the Court instructed Plaintiffs that, if they intended to rely on the radiocarbon testing, "they should clarify how the testing supports their claim that the '100% Natural' label is false or misleading. Greater specificity is required." Docket No. 30 (Order at 7). The following paragraphs from the FAC address radiocarbon testing:

> 7. Plaintiffs conducted radiocarbon (C-14) testing on six different flavors of Polar Seltzers in order to quantify the amount of synthetic material present in each sample. The results of the tests are reported as "% Biobased Carbon" wherein 100% Biobased Carbon indicates that a material is entirely sourced from plants or animal by-products (i.e., "100% Natural"). Conversely, any result less than 100% Biobased Carbon indicates the presence of synthetics (i.e., petrochemicals) in the Product.
>
> . . . .
>
> 9. Carbon-14 testing demonstrated that two flavors (Cranberry Lime and Ruby Red Grapefruit (collectively, "Class Products")) were 27% and 28% synthetic, respectively. Despite claiming that the Class Products were "100% Natural," they each contain a material amount of synthetic compounds rendering the claim "100% Natural" false, misleading and in violation of the law.
>
> . . . .
>
> 56. Plaintiffs conducted radiocarbon (C-14) testing on multiple samples of Polar Seltzer to quantify the percentage of synthetic

---

[3] As the Court noted at the hearing, an analogy could be made to a § 1983 case where a plaintiff knows that a police officer in a given police department caused the plaintiff injury but the plaintiff does not know the precise name of the police officer.

United States District Court
Northern District of California

material present in the samples.

57.     Radiocarbon dating is a scientific method to determine the age of organic materials up to about 60,000 years old, based on the predictable decay of the radioactive isotope Carbon-14 after an organism dies.  It is one of the most definitive analytical methods for distinguishing between natural and synthetic materials (*e.g.*, those derived from petrochemicals).  Living organisms absorb a known level of the weakly radioactive isotope carbon-14 from the atmosphere.  Scientists measure the amount of carbon-14 remaining in a sample using an accelerator mass spectrometer ("AMS").  A 100% bio-based (natural) material will result in a finding of 100% Modern Carbon.  Conversely, a completely synthetic, petrochemical-derived substance will result in a finding of 0% Modern Carbon.  A blend of natural and synthetic sources will have a result somewhere in between.

58.     The results of Plain[ti]ffs' [sic] C-14 testing show that Polar's Cranberry Lime and Ruby Red Grapefruit flavors are 27% and 28% synthetic, respectively[] – undeniably rendering false and misleading Defendant's claim that the Products are "100% Natural."

FAC ¶¶ 7, 9, 56-58.  The expert declaration attached to the FAC states:

3.     Polar beverage analyses: A series of Polar-brand flavored carbonated waters were analyzed to determine bio-based (natural) content. To do this, samples were submitted for radiocarbon analysis, a technique that determines the percentage of carbon in a sample that has both fossil (petroleum based) and modern (recently harvested/deceased plant or animal) origins. Out of six flavored waters tested, two returned results that showed considerable percentages of fossil carbon (i.e., synthetic, carbon originating from petroleum sources), namely Cranberry Lime (Lot 240519D1C034, 73% modern carbon) and Ruby Red Grapefruit (240810D2C034, 72% modern carbon).

Keranen Decl. ¶ 3.

Although Plaintiffs have made strides in explaining why the radiocarbon testing shows the presence of synthetics, there are still some notable gaps.  There are two gaps of particular note.  First, while it appears radiocarbon testing reveals the presence of petroleum or petroleum-based compounds, Plaintiffs have failed explain how the radiocarbon testing discloses the presence of *petrochemicals* specifically – *i.e.*, to address whether radiocarbon testing that results in less than 100% "modern carbon" *necessarily* indicates the presence of petrochemicals (and not something else).  Second, Plaintiffs have not clearly alleged that petrochemicals are *always* or at least

*typically* synthetic (*i.e.*, manmade or not natural).[4]  *See also* Mot. at 11 (arguing that the FAC "reprises the previous complaint's implication that entirely all carbon of an ancient, 'fossil,' or non-'modern' vintage somehow corresponds to (a) synthetic (b) petrochemicals[;] . . . like its predecessor, the [FAC] leaves both those purported links undeveloped and conclusory").

In their papers, Plaintiffs assert that Polar is simply challenging their methodology which is a matter that should be reserved for summary judgment or trial.  *See* Opp'n at 4.  But even Plaintiffs' cited authority states that an alleged inadequacy in methodology "do[es] not warrant dismissal under Rule 12(b)(6) *so long as* the court can still reasonably infer from the testing result and other alleged facts, taken as true, that the defendant is liable for the misconduct alleged." *Warren v. Whole Foods Market Cal., Inc.*, No. 21-cv-04577-EMC, 2022 U.S. Dist. LEXIS 120865, at *17 (N.D. Cal. July 8, 2022) (emphasis added).  Although Plaintiffs allege that radiocarbon testing "is one of the most definitive analytical methods for distinguishing between natural and synthetic materials (*e.g.*, those derived from petrochemicals)," FAC ¶ 57, its explanation is conclusory in some respects, and the Court cannot say that Polar is liable for false advertising in representing the product as "100% Natural" without having these gaps identified above addressed.

Accordingly, the Court grants Polar's motion to dismiss.  The Court, however, shall give Plaintiffs one final opportunity to amend their complaint to address the deficiencies identified above.

C.    Sufficiency of Testing

While the Court grants Polar's motion to dismiss for the reasons stated above, it still addresses Polar's remaining arguments as, potentially, they could provide an independent basis for

---

[4] Per the FAC, the FDA "considers 'natural' to mean nothing artificial or synthetic is included in, or has been added to, the product that would not normally be expected to be there."  FAC ¶ 31.

To be clear, Plaintiffs have not claimed that the "100% Natural" label is misleading because of the way that an ingredient is processed.  Rather, they assert that the label is misleading because an ingredient is in fact synthetic.  *Compare Valencia v. Snapple Beverage Corp.*, No. 23-cv-1399, 2024 WL 1158476, at *6 (S.D.N.Y. Mar. 18, 2024) ("A reasonable consumer would not think that a compound found in nature is artificial even if it is produced in a different way than nature produces it, *if* the way it is produced is that it is derived from a natural product *and* does not contain anything synthetic.") (emphasis added).

dismissal. Polar's remaining arguments are largely directed at the sufficiency of the testing done by Plaintiffs. Specifically, Polar's main arguments are: (1) Plaintiffs failed to test any seltzer actually bearing the "100% Natural" label, *see* Docket No. 30 (Order at 8) (stating that "[i]t should not be difficult for Plaintiffs to [allege] that they tested *x* different flavors . . . *with the challenged labeling*") (emphasis added), and (2) Plaintiffs tested only a single can of each flavor.

        1.      Testing of Product Bearing "100% Natural" Label

With respect to (1), Plaintiff state in their opposition that they "tested six flavors, all of which bore packaging containing the identical '100% Natural' claim." Opp'n at 5. But that is not exactly what Plaintiffs alleged in the FAC. In the FAC, Plaintiffs alleged that they tested the flavors and that

> [e]ach of the flavors tested were available for sale during the period of time in which Plaintiffs made their respective purchases. Each of the flavors were labeled as being 100% Natural and were available for retail sale to the consuming public at the time the original Complaint in this matter was filed.

FAC ¶ 8. These allegations do not clearly establish that Plaintiffs tested seltzers bearing the "100% Natural" label, which is a particular point of concern because Polar previously represented that its seltzers no longer use that label. *See* Docket No. 30 (Order at 10) (taking note of Polar's claim that "its seltzer water no longer bears the '100% Natural' label, but [adding] that is outside the four corners of the complaint") (emphasis added). Plaintiffs' allegations above arguably suggest that Plaintiffs tested the flavors recently (which may or not have had the label) and are simply assuming that the composition of the flavors is the same as the composition of the flavors that were being sold at the time of the original complaint and/or at the time Plaintiffs purchased the products.

At the hearing, Plaintiffs stated on the record that they could correct any deficiency in the FAC – that is, they could clearly and explicitly allege in an amended pleading that the products they tested did, in fact, bear the "100% Natural" label. That being the case, the Court shall dismiss Plaintiffs' claims for failure to clearly allege that the products tested bore the contested label; however, Plaintiffs have leave to amend.

2.    Limited Number of Tests

Polar argues next that, even if Plaintiffs did test seltzers bearing the "100% Natural" label, they only tested a single can of each contested flavor (cranberry lime and ruby red grapefruit). Polar contends that the testing of a single can does not reflect a systemic problem with the product. *See* Mot. at 14.

In response, Plaintiffs do not dispute that there was testing of only a single can for each flavor at issue. They argue, however, that the results of this testing "may be plausibly attributed to the line of identically flavored Products." Opp'n at 5. In support, Plaintiffs make the following allegation:

> Upon information and belief, each Class Product is manufactured pursuant to a uniform and standard formulation, employing common flavor bases. Such manufacturing consistency is required under the Federal Food, Drug, and Cosmetic Act. Current Good Manufacturing Practice regulations applicable to food manufacturers mandate[] establishment of controlled processes to ensure that each lot conforms to established specifications. Moreover, the FDCA requires beverages to have truthful, accurate, and non-misleading labels, which further presupposes consistency in formulation. Finally, a consistent taste profile provided by identical flavorants is critical for consumer acceptance and brand loyalty, further supporting product consistency across all lots manufactured in the Class Period.

FAC ¶ 63.

Plaintiffs' position is arguably problematic. Their main rationale – that consistency can be inferred from the fact of government regulation – could be applied to every food and drink; in other words, a single test would always be considered representative. On the other hand, if Plaintiffs are suggesting that it makes more sense to require more testing when a product is "contaminated" by an ingredient that it is not supposed to contain, that is a fair point. *See, e.g.,* *Pineda v. Lake Consumer Prods., Inc.*, No. 5:24-cv-1074-JMG, 2024 U.S. Dist. LEXIS 220895, at *10 (E.D. Penn. Dec. 5, 2024) (discussing a Third Circuit case where "thirteen samples of the defendant's products were tested" and where "'[t]welve of these samples, *all with lot numbers beginning TN*, contained detectable levels of benzene'[;] [t]he fact that the lot number was specified was significant, as 'TN' was one of the lot numbers subject to the defendant's recall'") (emphasis in original); *Levy v. Hu Prods. LLC*, No. 23 Civ. 1381 (AT), 2024 U.S. Dist. LEXIS

United States District Court
Northern District of California

10

37487, at *2-3 (S.D.N.Y. Mar. 21, 2024) (where plaintiff alleged that defendants deceptively marketed their dark chocolate bars as clean when they in fact contained significant amounts of lead, taking note that testing was done of 2-3 samples with at least two distinct lot codes for each model).

In any event, the Court need not resolve the issue because, here, there are additional facts alleged in Plaintiffs' FAC that give rise to inferences in their favor. First, the level of alleged synthetics – more than 25% of the natural flavors – suggests that the presence of synthetics was not an accident. Second, the fact that synthetics at that level were found across two different flavors also suggests that the presence of synthetics was not an accident.

In its papers, Polar has cited several cases indicating that a single test is insufficient to give rise to an inference of a widespread problem. *See, e.g.*, *James v. Primal Nutrition, LLC*, No. 1:25-cv-691-SAB, 2025 U.S. Dist. LEXIS 227962, at *12 (E.D. Cal. Nov. 19, 2025) ("Plaintiff relies on testing conducted by Mamavation, which tested only one product per brand. Those limited results do not support a plausible inference that some or even all of Defendant's Avocado Oil sold during the class period contained phthalates. Indeed, Mamavation's own report acknowledges: 'Because Mamavation only tested one product per brand, we cannot claim to know if these issues are, in fact, industry-wide or portfolio-wide.'"); *Brown v. Coty, Inc.*, No. 22-cv-2696 (AT), 2024 U.S. Dist. LEXIS 36146, at *11 (S.D.N.Y. Mar. 1, 2024) ("[T]he Test is not alleged to have found that the presence of PFAS is 'systemic' in Lash Blast or Clump Crusher. . . . Without more, the Court cannot know if all tested tubes of Lash Blast and Clump Crusher tested positive for similar levels of the identified PFAS – or if a single tube tested positive, while every other tested tube showed no signs of PFAS. In the latter case, the Court cannot plausibly infer that the few tubes purchased by Plaintiffs over a span of years contain PFAS."). However, as noted above, there are additional facts in this case that favor Plaintiffs.

Furthermore, the Court takes into account a Ninth Circuit decision which issued shortly before this Court's first 12(b)(6) order and which is favorable to Plaintiffs. *See Scheibe v. ProSupps USA, LLC*, 141 F.4th 1094 (9th Cir. 2025). *Scheibe* was a misbranding case. The plaintiff bought a dietary supplement which had a label stating that it had zero calories and zero

11

United States District Court
Northern District of California

grams of carbohydrates.  But he conducted "preliminary testing [which] found that the supplement contained 5.68 grams of carbohydrates and 51 calories per serving, far exceeding the FDA's allowable margins for zero-carbohydrate and zero-calorie labeling." *Id.* at 1097.  The plaintiff sued the company making the supplement for violation of California consumer protection laws.

The company moved to dismiss on the basis that the state claims were preempted by the FDA – *i.e.*, because they held the company to a different standard for labeling than the FDA does.  (The FDA preempts state laws that establish requirements for nutrition labeling that is not identical to the FDA's nutrition labeling requirements.)  The district court agreed with the company that the claims were preempted, although it noted that there was

> a divide between district courts in the Ninth Circuit.  Some courts hold that to avoid preemption of state-law mislabeling claim, plaintiffs must plead that they followed the FDA's testing methods and sampling processes.  Other courts hold that plaintiffs need only allege facts that allow a court reasonably to infer that a product would be misbranded if it were tested using the FDA's testing methods and sampling processes.

*Id.* at 1098.

On appeal, the Ninth Circuit reversed.  It began by noting that preemption was an affirmative defense that the company had to prove; thus, the question was whether the plaintiff's complaint on its face supported the affirmative defense.  If the complaint alleged that the supplement was mislabeled within the meaning of the FDA, then there would be no preemption.  *See id.* at 1098-99.

> The FDA requires manufacturers to determine a nutritional supplement's content **by testing a sample consisting of "a composite of 12 subsamples (consumer packages) or 10 percent of the number of packages in the same inspection lot**, whichever is smaller, randomly selected to be representative of the lot."  For carbohydrates, the FDA requires testing each sample according to a method prescribed by the Association of Official Analytical Collaboration ("AOAC") International.  For calories, the FDA requires the use of any of the six approved methods for testing each sample, one of which is bomb calorimetry testing.
>
> ProSupps fails to show that Scheibe's nutritional content claims are preempted because Scheibe plausibly pleads that the supplement is mislabeled in a way that also violates the Act.  Scheibe alleges that his testing methods complied with FDA regulations: he used the AOAC method for carbohydrates and bomb calorimetry for calories.  But he does not allege that he complied with the FDA's sampling

process. Instead, Scheibe simply alleges that **one sample** of the supplement, tested by an independent laboratory, contained more carbohydrates and calories than ProSupps listed on the supplement's label. **Still, his preliminary testing of that one sample is enough to avoid preemption on the pleadings because it allows a court to draw a reasonable inference that testing a composite sample according to FDA regulations would show that the supplement is misbranded under the Act. Scheibe's single sample contained several times more carbohydrates and calories than the FDA allows to be listed as zero on the label. It is plausible that additional samples would contain similar amounts of nutrients. And even if those samples contained far fewer carbohydrates and calories than Scheibe's original sample, they still could lead to a result that exceeds the margins for zero-carbohydrate or zero-calorie labels and thereby establish misbranding under the Act.**

Maybe Scheibe's first and only test result is an outlier. Perhaps additional tests in discovery will confirm that the supplement really does contain zero carbohydrates and zero calories within the margins set by the FDA. But the Federal Rules of Civil Procedure do not cast judges as skeptics of pleadings. . . . ProSupps speculates that "it may also be that this testing based on a single sample was inaccurate" or that "the averaging across 12 samples could provide results consistent with the labeling[.]" These lingering possibilities do not make Scheibe's mislabeling allegations implausible. Because Scheibe's test of a single sample allows a court reasonably to infer that the supplement would be misbranded if it were tested using the FDA's twelve-sample process, Scheibe's state-law claims are not preempted.

*Id.* at 1099 (emphasis added).

Neither party raised *Scheibe* in their papers. And *Scheibe* is arguably distinguishable because it dealt with an affirmative defense for which the defendant bore the burden of proof. Nevertheless, the case still has some bearing for the case at bar, especially since the radiocarbon testing done by Plaintiffs indicated that more than a quarter of the natural flavors in each product was synthetic.

D.      Plaintiffs' Standing

Polar further argues that there is a standing problem for one plaintiff – Ms. Toll – because, as alleged in the FAC, she purchased only the ruby red grapefruit flavor, and not the cranberry lime flavor. *See* FAC ¶ 25 (mentioning purchase of ruby red grapefruit only). Polar maintains that she has standing only to represent those who purchased ruby red grapefruit, and not cranberry lime.

/ / /

13

At this juncture in the proceedings, the Court rejects the standing argument. Plaintiffs have indicated that the ingredients making up the natural flavors for *both* products are largely the same. *See* Opp'n at 8 (chart reflecting that the products have only one ingredient). Accordingly, Ms. Toll has a basis to claim standing as to both products given their similarity (as may reasonably be inferred at this juncture) even though she apparently purchased only one.

E.    Knowledge of Synthetic – CLRA and Punitive Damages

Finally, Polar argues that, at the very least, Plaintiffs' CLRA claim, plus its claim for punitive damages, should be dismissed because Plaintiffs have failed to sufficiently allege that Polar *knew* its product was not "100% Natural." Polar points to allegations in the FAC indicating that a manufacturer may not know what ingredients there are in the "natural flavors" that it is given by its flavor formulator. *See* FAC ¶ 10 (alleging that the manufacturer of the product may not know the components that make up the "natural flavors"; under 21 C.F.R. § 101.22(g)(2), "[w]hen a flavor is sent to [the] manufacturer of a product and 'consists of two or more ingredients, the label of that flavor product may either list each ingredient by common or usual name or may state 'All flavor ingredients contained in this product are approved for use in a regulation of the Food and Drug Administration'").

As an initial matter, the Court bears in mind that it is not clear that the CLRA necessarily requires knowledge on the part of the defendant. In *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136 (9th Cir. 2012), a defective product case, the Ninth Circuit did state that the plaintiffs had to allege knowledge of the defect to succeed on their CLRA claim. *See id.* at 1145 (taking note that the "CLRA prohibits 'unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction *intended to result or which results in the sale or lease of goods or services* to any consumer'")[5] (emphasis in original). But in a more recent decision,

_____

[5] The provisions of the CLRA that Plaintiffs reference in their pleading are California Civil Code § 1770(a)(5), (7), (9) ("The unfair methods of competition and unfair or deceptive acts or practices listed in this subdivision undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful: . . . (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have. . . . (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of

14

which involved false advertising, the Ninth Circuit stated that "a defendant can violate the UCL, FAL, and CLRA by acting with mere negligence." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1019 n.11 (9th Cir. 2020). This has led at least one district court to comment that "[t]he level of knowledge required under the CLRA" is not well settled.

> *Wilson* was a product defect case, and the claim at issue was based on the *sale* of the defective product and not its being mislabeled or falsely advertised. In other words, the plaintiffs in *Wilson* asserted a theory of misrepresentation based on the defendant's omissions, rather than any affirmative misrepresentation. Even so, some courts have applied *Wilson'*s knowledge requirement to affirmative misrepresentation claims (and to claims not involving product safety defects). Other courts have read *Wilson* more narrowly. Given this ambiguity, and given that both parties agree that negligence is the appropriate standard under at least the FAL, the Court will assume for present purposes that knowledge of the falsity is not a requirement under the CLRA on the facts of this case.

*Favell v. Univ. of S. Cal.*, CV 23-3389-GW-MARx, 2024 U.S. Dist. LEXIS 12138, at *13-15 (C.D. Cal. Jan. 23, 2024).

But even assuming knowledge is required for the CLRA, knowledge would include not just an intent to defraud but also a reckless disregard of the truth. *See, e.g.*, *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997) ("'[F]alse representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered.'"). Reckless disregard is also a theory recognized for punitives. *See* Cal. Civ. Code § 3294(a) (under California law, providing for punitives where "it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice"; while fraud is defined as "intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury," malice is defined as, *inter alia*, "conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others"); *Valensi v. Park Ave. Op. Co., LLC*, 94 N.Y.S.3d 311, 313 (2019) (under New York law, stating that "[p]unitive damages may be assessed

_____

another. . . . (9) Advertising goods or services with intent not to sell them as advertised.").

where a defendant's actions evinced a high degree of moral culpability which manifested a conscious disregard for the rights of others or conduct so reckless as to amount to such disregard[;] [s]uch damages may be imposed for wanton or reckless disregard for the safety or rights of others where the conduct is sufficiently blameworthy, and the award of punitive damages . . . advance[s] a strong public policy of the State by deterring its future violation") (internal quotation marks omitted).  That being the case, it is reasonable to infer that Polar acted with conscious disregard by choosing to advertise its seltzers as "100% Natural" even if Polar did not actually know whether the natural flavors (if, *e.g.*, obtained from a flavor formulator) were natural or synthetic.  Conscious disregard is supported by the allegations indicating that Polar deliberately chose to use the "100% Natural" label to take advantage of the "clean label movement."  FAC ¶ 37; *see also* FAC ¶ 38 ("By representing the Product is '100% Natural,' Defendant seeks to capitalize on consumer preference for clean label products.").

### III.     CONCLUSION

For the reasons stated above, Polar's motion to dismiss is granted.  Plaintiffs' FAC is deficient because their allegations related to radiocarbon testing as proof of inclusion of synthetic, manmade ingredients have gaps and because they have not clearly alleged that the seltzers they tested bore the contested "100% Natural" label.  Plaintiffs have leave to amend their complaint. The amended complaint shall be filed within three weeks of the date of this order.  If no amended complaint is timely filed, then the dismissal ordered here shall be deemed one with prejudice, and the Clerk of the Court will be directed to enter a final judgment in Polar's favor.

This order disposes of Docket No. 43.

**IT IS SO ORDERED**.

Dated: February 18, 2026

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

16